IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| NEWTON C. MULLINS, | ) | CASE NO. 09-70595 |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM DECISION

The matters before the Court are the Debtor's Third Amended Disclosure Statement filed on April 20, 2010 ("Amended Disclosure Statement"), Third Amended Plan of Reorganization ("Amended Plan") filed on April 20, 2010, and Motion to Confirm Plan Notwithstanding Balloting "Cramdown" ("Motion to Confirm") filed on May 27, 2010. Following a hearing held on June 1, 2010 at which the Debtor was the only party in interest to appear, the Court took these matters under advisement. For the reasons that follow the Court will deny confirmation of the Amended Plan.

## FINDINGS OF FACT

The Debtor practices dentistry through a wholly owned professional corporation known as Newton C. Mullins, Jr., D.D.S., P.C. He initiated this personal bankruptcy proceeding by filing a Chapter 11 voluntary petition on March 16, 2009. On April 9, 2010, the Court entered an Order denying confirmation of the Debtor's Second Non Material Amended Plan of Reorganization and granted the Debtor fourteen days to file a further amended plan and disclosure statement. On April 20, 2010, the Debtor filed the Amended Plan and Disclosure Statement now before the Court. On April 26, 2010, the Court entered an Order conditionally approving the Amended Disclosure Statement; fixing May 27, 2010 as the last day for filing

written objections to the Amended Disclosure Statement; fixing May 25, 2010 as the last day to file objections to the Amended Plan and setting a hearing on confirmation for June 1, 2010.

The Amended Plan provides for payment to three classes of secured claims and two classes of unsecured claims, as well as the payment of administrative and priority claims. Class 1 consists of priority claims, which the Debtor proposes to pay in full if there are any such claims. Class 2 consists of the secured claim of New Peoples Bank on the Debtor's home in the amount of $272,317.65. Class 2A consists of another secured claim of New Peoples Bank on the Debtor's rental property of $125,913.92. Class 2B consists of a secured claim of Ford Motor Credit Company on the Debtor's 2006 Ford Freestyle automobile.[1] The Debtor proposes to pay all secured creditors regular monthly installments with interest until their debts are paid, except that as to the secured claim of New Peoples Bank on the Debtor's rental property, that property shall continue to be marketed for sale and sold, with the proceeds being first used to pay the costs of sale, then the remaining balance due on the New Peoples Bank loan, with any surplus being devoted to the payment of Class 3 creditors.[2] Class 3 consists of the general unsecured

---

[1] According to a Consent Order entered February 9, 2010, the Debtor is to pay Ford Motor Credit $774.10 per month commencing February 2010 and continuing until that vehicle is paid in full. The Amended Disclosure Statement also notes that Ford Motor Credit is to be receive its regular monthly installment with interest at the contract rate, which is 0%.

[2] According to Schedules A and D filed on April 7, 2009, the Bristol, Tennessee rental property has a value of $135,000.00, secured by a claim of New Peoples Bank in the amount of $125,913.82. Schedule I indicates that the Debtor receives rental income of $700.00 per month from this property. Schedule J reveals that the monthly payment to New Peoples Bank on the rental property is $935.51. Debtor's counsel has previously indicated to the Court that the property does appear to have a negative impact on the cash flow of the Debtor, but as the property generates income, the Debtor felt it was better to try to retain the property and liquidate it rather than surrender the property to New Peoples Bank. The Monthly Operating Reports from February 2010 through May 2010 do not include any rental income during these months. The most recent Monthly Operating Report that shows any rental income is for January 2010.

creditors of the Debtor, who were owed on the petition date, according to Schedule F filed on April 7, 2009, the aggregate sum of $970,844.46. According to the Amended Plan, the Debtor proposes to pay his net monthly income to his general unsecured creditors in an amount not less than $1,000[3] per month over a period of 96 to 105 months until he has paid 12%[4] of their claims. The Amended Plan states that the payout to unsecured creditors will be approximately $105,910, while the Amended Disclosure Statement estimates this amount to be $116,501. In addition, any equity realized from the sale of the Debtor's rental property shall be paid to the unsecured creditors.[5] Class 3A consists of contingent unsecured obligations owed by the Debtor due to his guarantees of corporate secured debt of Newton C. Mullins, Jr., D.D.S., P.C.[6] According to the

---

According to the Amended Disclosure Statement, someone committed suicide in the rental property, leaving a hazard that had to be cleaned, and the property suffered extensive damage by tenants that had to be repaired. Exhibit G ("Projections of Cash Flow and Earnings for Post-Confirmation Period") to the Amended Disclosure Statement indicates that the Debtor expects to receive $8,400 per year in rental income over the next five (5) years.

[3] However, page 11 of the Amended Disclosure Statement indicates that the expected payout will take between 96 and 105 months at $1,100 per month.

[4] While the Amended Plan on both pages 1 and 4 indicates that the Debtor intends to pay all unsecured creditors 12% of their claims, page 5 of the Amended Plan notes that the bookkeeper will distribute the dividends to each unsecured creditor until each creditor has received 10% of its allowed claim.

[5] The Amended Plan states as follows with respect to this property: "In addition, any equity realized from the sale of his rental house shall be paid to the general unsecured creditors. Total payout to the class shall be 12%, plus the net equity from the sale of the rental house." Neither it nor the Amended Disclosure Statement contains any information as to a projected date by which such property will be sold and its proceeds distributed or the amount of the likely net proceeds therefrom. Indeed, neither appears to contain a definitive commitment to sell such property during the term of the Amended Plan, although such action seems to be implied by the documents taken in their entirety, even though page 10 of the Amended Disclosure Statement states "payments end when 12% total is paid."

[6] The U.S. Income Tax Return for an S Corporation, Form 1120S, for the year 2009, attached to the Amended Disclosure Statement, lists the name of the corporation as Newton

Amended Plan, this class includes at least Matsco, Manifest Funding Services and Financial Pacific. A Proof of Claim was filed by each of these creditors in the amount of $324,141.27, $97,814.40 and $21,583.61 respectively, for a total of $443,539.28. These debts shall be reaffirmed in the amount of fifty percent (50%) of the outstanding balance of the debt as of the effective date of the Plan. Finally, Class 4 consists of the interests of the Debtor in the property of the estate, which Debtor proposes to retain at the conclusion of the case.

Per Schedule A, at the time the petition was filed, the Debtor owned two pieces of real property: the rental property in Bristol, Tennessee valued at $135,000 and his personal residence in Big Stone Gap, Virginia valued at $305,000, subject to a mortgage indebtedness of $125,913.82 and $272,317.65 respectively. According to Schedule B, at the time of filing, the Debtor owned the following personal property with a total value of $74,575: Cash in the amount of $300 (all of which was claimed as exempt on Schedule C); a checking account in the amount of $200 (all of which was claimed as exempt); furniture valued at $15,000 ($5,000 of which was claimed as exempt); computer equipment valued at $100; books, pictures and art, cd collection and sports memorabilia with a total value of $15,000 ($4,500 of which was claimed as exempt); clothing valued at $5,000; wedding rings valued at $2,000 (all of which was claimed as exempt); golf clubs and equipment valued at $1,000 (all of which was claimed as exempt); 2006 Ford Freestyle valued at $12,650; 2008 Ford Fusion valued at $14,325; dental equipment and supplies

---

Carroll Mullins, DDS, PC. According to Schedule L of this Form, as of December 31, 2009 the Debtor's professional corporation had total assets of $351,224 with total current liabilities (payroll taxes payable) of $6,339 plus an additional $408,143 in mortgages or notes payable in 1 year or more. As of December 31, 2009, the tax return shows retained earnings of -$66,258. Line 3 of this Form shows a gross profit of $632,656 for the corporation, which after total deductions of $605,644 left ordinary business income for the year of $27,012. Included in those total deductions was compensation to Dr. Mullins in the amount of $143,000.

valued at $8,000; family dogs valued at $1,000 (all of which was claimed as exempt). The Debtor testified rather hesitantly and equivocally at the January 5, 2010 hearing on confirmation of the prior plan as to the value of his dental practice, but seemed to be of the opinion that it did have value, possibly a fairly significant amount. It is not listed in the bankruptcy schedules, however.

According to Exhibit E ("Plan Proponent's Estimated Liquidated Value of Non Exempt Assets") to the Amended Disclosure Statement, the Debtor's total assets at liquidation value total $84,000. The Debtor estimates that, after Chapter 7 Trustee's commission, Chapter 11 administrative expenses, U.S. Trustee fees and costs of sale of real estate, $40,350.00 would be available for distribution to general unsecured creditors under a Chapter 7 liquidation, which would result in the unsecured creditors receiving 4.48% of their claims. Based upon a six percent (6%) interest (or discount) rate, the present value, as of the effective date of the Plan, of the proposed payments to the general unsecured creditors of $1,000 per month for 105 months is $81,534.06, which is more than twice the purported liquidation value of the Debtor's property.

No objection was filed to either the Amended Disclosure Statement or the Amended Plan. On May 27, 2010, the United States Trustee filed a Statement indicating that his Office had reviewed the Amended Disclosure Statement and modified Plan and had no objection, but added that the Debtor should be required to introduce evidence that the proposed plan meets all of the requirements for confirmation contained in 11 U.S.C. § 1129(a) and (b). The Debtor filed a Plan Ballot Summary on May 27, 2010 showing that one creditor in Class 2B accepted the Amended Plan (total claim of $7,741.10); one creditor in Class 3 accepted the Amended Plan (total claim of $114,047.54) while five creditors holding claims aggregating

5

$58,293.92 in such Class voted against it; and one creditor in Class 3A accepted the Amended Plan (total claim of $324,141.27). The Debtor also indicated that cramdown was requested and filed a Motion to Confirm requesting that the plan be "crammed down" pursuant to 11 U.S.C. § 1129(b).

Based on the foregoing findings of fact and other evidence presented at the confirmation hearing or appearing in the Amended Disclosure Statement, the Court finds that the Amended Plan satisfies the confirmation requirements set forth in 11 U.S.C. § 1129(a) other than sub-section (8) thereof, which requires "[w]ith respect to each class of claims or interests – [that] (A) such class has accepted the plan; or (B) such class is not impaired under the plan."

## CONCLUSIONS OF LAW

This Court has jurisdiction over this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984. The Court's consideration of the Debtor's Amended Disclosure Statement and Amended Plan is a "core" bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

The burden of proof to establish that a chapter 11 plan satisfies the statutory requirements for confirmation falls on the plan's proponent. *See In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3rd Cir. 2003). *See generally*, B. Russell, *Bankruptcy Evidence Manual*, Vol. 2, § 301.76 at pp. 349-52 (West, 2009-2010 ed.)**.**

One of the requirements for a chapter 11 plan confirmation is that each impaired class of creditors accepts the treatment provided for them in such plan. 11 U.S.C. § 1129(a)(8).

Such a class "accepts" a plan when creditors in that class holding "at least two-thirds in amount and more than one-half in number of the allowed claims of such class . . . that have accepted or rejected such plan" vote to accept it. 11 U.S.C. § 1126©. Under this standard it is clear that Class 3 has not accepted the Amended Plan. Nevertheless, the Court is directed to confirm a plan which has not been accepted by every impaired class if at least one impaired class has accepted the plan and the Court determines that such plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each impaired class which has not accepted the plan. 11 U.S.C. § 1129(b)(1).

Both Class 3 (the general unsecured creditors) and Class 3A (the Debtor's unsecured guaranties of corporate secured debt) are impaired, the former much more so than the latter. The former Class stand to get, principally if not entirely out of the Debtor's post-confirmation income, 12% of their claims over a period of at least eight years if the Amended Plan before the Court is confirmed and successfully completed, plus the possibility of some proceeds from the sale of the rental house. It appears that the Debtor's ability to make these payments is dependent upon his continued ability and willingness to practice dentistry. On the other hand, Class 3A are not likely to receive anything from the Debtor's personal income and assets unless his continued practice as a dentist is compromised because it is anticipated that the regular contractual payments on the corporate secured debt will be made by the professional corporation. In short, only if something goes wrong will Class 3A creditors expect to collect anything from the bankruptcy estate pursuant to the Debtor's guaranties of the obligations owed to them. If that were to occur, the Amended Plan provides that such creditors' claims on the Debtor's guaranties of their financing would be capped at 50% of the outstanding balances of

such obligations as of the effective date of the Amended Plan. Having then recourse both to the equipment and other assets owned by the corporation as well as the Debtor's guaranties, it would appear as a practical matter that such creditors are not much damaged, and indeed may actually be benefitted, by the bankruptcy case as the Debtor's obligations to his other unsecured creditors would be largely eliminated if he successfully completes the Amended Plan. These secured creditors have provided equipment essential to the proper functioning of the professional corporation and their payment seems to be essential to a successful reorganization because without such equipment the Debtor's ability to practice his profession must be in substantial doubt. Nevertheless, when the general unsecured creditors compare a 12% settlement for them with a 50% obligation on the unsecured guaranties of the corporate secured debt, it is not too surprising that most of those Class 3 creditors who returned ballots rejected the Amended Plan.

    As to the discrimination prong of the § 1129(b) test, it is clear that absence of all discrimination is not required, but rather that any discrimination which is proposed is not "unfair." *See Ownby v. Jim Beck, Inc.* (*In re Jim Beck, Inc.*), 214 B.R. 305, 307 (W.D. Va. 1997), *aff'd*, 162 F.3d 1155 (4th Cir. 1998); 7 *Collier on Bankruptcy* ¶ 1129.03[3] at p. 1129-64 - 65 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). The Court concludes that the discrimination as to the general unsecured claims vis-à-vis the unsecured guaranty claims under the circumstances presented here, while initially troublesome, is not ultimately unfair. Its reasons for that conclusion are as follows:

1. The earnings which Dr. Mullins will generate to be used in significant part to fund the obligations of the Amended Plan are largely dependent upon his ability to continue working as a dentist. Without that earning power the prospects for a meaningful payout to his general

unsecured creditors are problematic.

    2. The ability of Dr. Mullins to practice dentistry is dependent upon his ability to retain the equipment owned by his professional corporation which its secured creditors have financed. Accordingly, the support of those creditors seems to be essential to his ability to propose a reorganization plan. Although these creditors will fare much better in the reorganization than will his general unsecured creditors, they are providing the means for the other creditors to be paid in part. If Dr. Mullins is able to maintain his health and dental practice, such creditors will likely be paid in full by the professional corporation. Only if that fails will they have a claim against the income and other assets owned personally by Dr. Mullins. In contrast his general unsecured creditors do not have a claim against his professional corporation and their payment will come from his personal earnings.

    3. Based on the dual claims of the corporation's secured creditors against both it and Dr. Mullins personally upon his guaranty agreements, while Class 3 creditors only have claims against him individually, and the necessity of payment of such secured creditors to the success of any reorganization involving the Debtor's continued practice of dentistry, it appears to the Court that the discrimination not only has a reasonable basis, but also that it is necessary for reorganization.

    4. The Debtor's good faith has not been challenged or otherwise been brought into question by the evidence.

    5. Because it appears highly unlikely that the Debtor has the earning ability to propose a plan which would offer a 50% payout to his general unsecured creditors and doubtful that he could obtain the support of the corporate secured creditors unless he offers more than a 12% cap

on his guaranty agreements with them, his ability to obtain confirmation of a reorganization plan which he can reasonably expect to perform appears unlikely absent the discrimination in question.

Therefore, the Court concludes that the Amended Plan does not unfairly discriminate against the Class 3 creditors.

The "fair and equitable" prong of the § 1129(b) "cramdown" test has been commonly referred to as the "absolute priority" rule because it generally prohibits any junior class of interests from receiving or retaining any interest if any senior impaired class does not accept the plan. This requirement was modified, however, by the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") with respect to chapter 11 cases in which the debtor is an individual. In such cases "the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of . . . section [1129]." 11 U.S.C. § 1129(b)(2)(B)(ii). The cross-referenced section 1115 of the Bankruptcy Code provides as follows:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 –
>
> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12 or 13, whichever occurs first.
>
> (b) Except as provided in section 1104 or a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.

10

Several published decisions have considered whether these provisions have the effect of eliminating the absolute priority rule completely from individual chapter 11 case confirmation decisions or only as to post-petition earnings and other property acquired by individual chapter 11 debtors after the commencement of the case. Three of those decisions have held in favor of total elimination of the absolute priority rule.[7] One has held that only post-petition earnings and acquired property are excluded, but not other property included in the bankruptcy estate by reason of the provisions of 11 U.S.C. § 541.[8] This Court will not undertake to repeat here the analysis contained in these decisions and chooses instead to refer the reader to the illuminating discussions contained in these decisions by some very highly regarded bankruptcy judges.

While the Court considers the result reached by the majority of these cases to be a very practical one and to make imminent sense from a bankruptcy policy perspective, it concludes that the result reached by Judge Tchaikovsky in the so far solo decision to the contrary is more consistent with the language of the statute. This Court agrees with her that the language of § 1129(b)(2)(B)(ii) is not ambiguous and that it only excepts from the absolute priority rule the debtor's post-petition earnings and other property acquired after the commencement of the case.[9] This Court believes that the courts in the majority have strained to find ambiguity in the statute in order to arrive at a construction which is more in keeping with the broader intent of

---

[7] *In re Shat*, 424 B.R. 854, 862-68 (Bankr. D. Nev. 2010); *In re Roedemeier*, 374 B.R. 264, 273-76 (Bankr. D. Kan. 2007); and *In re Tegeder*, 369 B.R. 477, 480 (Bankr. D. Neb. 2007).

[8] *In re Gbadebo*, 2010 WL 1568609 at *3 - 6 (Bankr. N.D. Cal. April 16, 2010).

[9] This Court also agrees with her that it has an independent duty not to confirm a plan which fails to satisfy the § 1129 confirmation requirements even when, as is also the case here, no party in interest has filed an objection to confirmation. *See Gbadebo* at *3, n.5.

certain BAPCPA provisions intended to make individual chapter 11 cases more similar to chapter 13 cases, which are not subject to the absolute priority rule. *See Roedemeier*, 374 B.R. at 275-76. This Court recognizes this broader intent, but that is not the same as concluding that statutory language which does not strike it as ambiguous at all should be relieved of its evident meaning. To be perhaps more specific, the Court believes that while the language used in the statute might lead one quite reasonably to the conclusion that it was not well thought out and didn't envision some of the practical problems that it would generate for the courts attempting to make individual chapter 11 cases work, such language does address the chief problem which Congress seems to have had in mind. The Court would characterize that "chief problem" as being that pre-BAPCPA cases for individual debtors whose principal business endeavor was the earned income which their personal efforts generated were problematic for chapter 11 debtors because their post-petition earnings were not deemed to be property of the bankruptcy estate. The new statutory language quite clearly changed that prior rule.

    The *Roedemeier* case, as does the present case before this Court, involved a dentist who provided professional services thru a professional corporation which he had established and owned prior to filing bankruptcy. Accordingly, the Kansas court quite reasonably observed that it wouldn't make much practical sense to exclude the post-petition earnings of the debtor from the operation of the absolute priority rule, but not the professional corporation which served as the vehicle for the operation of the dental practice which generated such income. While this Court agrees that such a result does seen anomalous, it does appear to be the result which follows in these particular circumstances from the language found in the statute. This "real world" difficulty of applying the statute appears to be an unintended

consequence of that language in situations very probably not contemplated by Congress when the language contained in the statute was chosen. To follow the rule adopted by the majority of prior decisions addressing this issue, however, would be to ignore an obvious reality, which is that if it had been the intent of Congress to eliminate entirely the operation of the absolute priority rule from individual chapter 11 cases, it would have been much clearer, easier and more direct for it to have said simply in § 1129(b)(2)(B)(ii) "except that in a case in which the debtor is an individual, this provision shall not apply" in lieu of the language which it did use, "except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 . . . ." The result reached by Judge Tchaikovsky and now by this Court maintains the absolute priority rule in individual chapter 11 cases with respect to property already owned by the debtor at the time of filing, i.e., property included in the bankruptcy estate under the authority of 11 U.S.C. § 541, but not as to the property brought into the estate by § 1115, i.e., post-petition earnings and other property acquired post-petition.

While this ruling undoubtedly makes individual chapter 11 cases less attractive and perhaps less available for debtors such as Dr. Mullins, the facts of this case demonstrate why Congress could have had a reasonable basis for making the policy choice indicated by the language it chose. This is not a case in which the Debtor simply proposes to retain only an existing professional corporation of no significant independent value to carry on his dental practice.[10] He also proposes to retain his residence valued at $305,000, subject to a mortgage debt of $272,317.65 requiring monthly payments of $1,670.48, a rental property valued at

---

[10] The Court observes that this ruling will present no obstacle to dentists and other professionals working for employers not owned by themselves or prevent them from establishing a post-filing professional corporation to carry on their practice.

$135,000, subject to a mortgage debt of $125,913.82 requiring monthly payments of $935.51,[11] and non-exempt personal property (not including the professional corporation) valued at $60,575. Obviously the payments made from the Debtor's income on the mortgage debts while he is making payments to his general creditors will increase his equity in such properties. Although the rental property currently is producing income, it is less than the mortgage payment upon such property, not to mention the other costs of ownership of such property. While the Amended Plan provides that if (or when) the rental property is sold, its net proceeds will be paid to the unsecured creditors, there is no deadline specific obligation to do so, and even if that happens, any likely benefit to creditors does not appear to be material. Neither is there any obligation, if such property is sold, to use the Debtor's additional net cash flow resulting from elimination of the mortgage payment and other ownership expenses either to increase the promised 12% distribution to his unsecured creditors or accelerate the date by which it will be accomplished.

It is neither the Court's intent nor its desire to frustrate the Debtor's attempts to reorganize his finances and resolve appropriately his obligations to his general unsecured creditors as well as his secured creditors. The proposal he has made in attempting to deal with a mountain of debt is not unreasonable. It did attract the support of the largest in amount Class 3 creditor filing a ballot upon the Amended Plan. That creditor alone was owed just slightly less than two-thirds of the aggregate debt owed to those Class 3 creditors casting ballots with respect to such Amended Plan. It should not be a difficult thing for Dr. Mullins to negotiate with some

---

[11] It is not clear whether this represents only the payment on the loan or also includes an escrow component for insurance and real estate taxes.

or all of the dissenting Class 3 creditors, just as he did with Class 3A creditors, to provide some additional consideration to that Class which will make enough of those creditors supporters of a sweetened Amended Plan and thereby obtain the consent of such Class to the treatment provided for them by such Plan.

For the foregoing reasons the Court will deny confirmation of the Amended Plan. An order to such effect, providing a reasonable period of time to enable Dr. Mullins to negotiate with some or all of his dissenting creditors as noted above or to file a further amended plan and disclosure statement, will be entered contemporaneously herewith.

DECIDED this 22nd day of June, 2010.

_____
William F. Stone, Jr.
UNITED STATES BANKRUPTCY JUDGE